MATTHEW G. SCHILTZ (*pro hac vice* forthcoming)
mschiltz@ftc.gov
RACHEL GRANETZ (*pro hac vice* forthcoming)
rgranetz@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone: (312) 960-5619 (Schiltz)
Telephone: (312) 960-5620 (Granetz)

Local Counsel:
DAVID L. HANKIN (CA BAR NO. 319825)
dhankin@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4317

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **MEDIAALPHA, INC.,** also d/b/a QuoteLab, a corporation, <br><br> and <br><br> **QUOTELAB, LLC,** also d/b/a MediaAlpha, a limited liability company, <br><br> Defendants. | CASE NO. ___2:25-CV-07263___ <br><br> **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Government and Business Impersonation Rule ("Impersonation Rule"), 16 C.F.R. Part 461.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, the TSR, and the Impersonation Rule.

## SUMMARY OF THE CASE

2.    Defendants deceive consumers interested in health plans and other insurance products into revealing valuable personal information so it can be used for robocalls and sold to the highest bidder.  To do so, Defendants have operated dozens of deceptive lead generation websites, such as ObamacarePlans.com, GovernmentHealthInsurance.com, and KentuckyHealthPlans.org.  In their advertisements enticing people to visit these sites, Defendants have falsely led consumers to believe that they are affiliated with state or federal government programs and that they offer special access to low-cost, comprehensive insurance plans.  As described in one of Defendants' documents, the sites look like they will allow consumers to "compare and purchase affordable health insurance plans, side-

by-side, the same way you shop for a plane ticket on Kayak [or] a TV on Amazon." On these sites, Defendants solicit contact, health, income, and other personal information from consumers, purportedly to sell them insurance plans.

3.      Defendants actually sell consumers nothing. Instead, after harvesting consumers' personal and contact information, Defendants auction it off to telemarketers and other lead generators. Defendants also robocall the consumers, and when they are able to get someone on the phone, they sell access to the "live" call to their telemarketer partners. Consumers who visit Defendants' websites and reveal their personal information frequently are bombarded with numerous unwanted calls, emails, and text messages from Defendants and their business partners. Many consumers have received dozens or even hundreds of such solicitations in a matter of days, and the intrusions can go on for months.

4.      Defendants also know their telemarketer partners frequently do not sell consumers the low-cost, comprehensive health insurance Defendants advertise. Instead, the telemarketers compound Defendants' deceptive claims, inducing consumers to purchase expensive products and services very different from those touted in Defendants' ads and on their sites. As a result of this misconduct, people who seek medical treatment learn they have no coverage for the care they need. Other consumers learn of the deception later when they are faced with substantial unexpected medical costs.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(3), and (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the TSR, 16 C.F.R. Part 310, and the Impersonation Rule, 16 C.F.R. Part 461.

## DEFENDANTS

8.     Defendant MediaAlpha, Inc., also doing business as QuoteLab, is a Delaware corporation with its principal place of business at 700 S. Flower St., Suite 640, Los Angeles, CA 90017.  MediaAlpha, Inc. is the majority owner of Defendant QuoteLab, LLC, through which it conducts its lead generation business described below.  MediaAlpha, Inc. transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, MediaAlpha, Inc. has advertised and

marketed healthcare and other products to consumers throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, MediaAlpha, Inc. also has acquired information from consumers throughout the United States and then advertised, marketed, distributed, or sold that information as leads to third parties throughout the United States.

9.      Defendant QuoteLab, LLC, also doing business as MediaAlpha, is a Delaware limited liability company with its principal place of business at 700 S. Flower St., Suite 640, Los Angeles, CA 90017.  QuoteLab, LLC transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, QuoteLab, LLC has advertised and marketed healthcare and other products to consumers throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, QuoteLab, LLC also has acquired information from consumers throughout the United States and then advertised, marketed, distributed, or sold that information as leads to third parties throughout the United States. MediaAlpha, Inc. and QuoteLab, LLC are referred to collectively herein as "MediaAlpha" or "Defendants."

## COMMON ENTERPRISE

10.     Defendants MediaAlpha, Inc. and QuoteLab, LLC have operated as a common enterprise while engaging in the deceptive acts and practices and other

violations of law alleged below.  Defendants have conducted the business practices

described below through interrelated companies that have common ownership,

officers, business functions, contact information, and office locations.  Because

these Defendants have operated as a common enterprise, each of them is liable for

the acts and practices alleged below.

**COMMERCE**

11.    At all times relevant to this Complaint, Defendants have maintained a

substantial course of trade in or affecting commerce, as "commerce" is defined in

Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

12.    Defendants operate a platform where they sell "leads:" access to, and

information about, consumers interested in health insurance or other products. In

public filings, Defendants have claimed their platform is the "largest online

customer acquisition channel" in the property and casualty, health, and life

insurance industries.  Each year, hundreds of telemarketers, lead generators, and

others, which Defendants call "demand partners," pay Defendants for leads.

During 2024, approximately 119 million leads were sold via Defendants' platform.

Those lead sales amounted to approximately $1.5 billion in gross transaction value

and approximately $865 million in revenue to Defendants in 2024 alone.

13.    Defendants sell three types of leads: (1) consumer contact and other

personal information; (2) "live" phone calls with consumers; and (3) "clicks" through third-party advertising Defendants disseminate online.  Live or "qualified" calls, where Defendants transfer consumers already on the phone directly to a demand partner, are extremely valuable; in some cases, Defendants can sell access to them for over $100.  Defendants sell their own leads as well as leads from third-party "supply partners," which pay Defendants a fee based on completed lead sales on Defendant's platform.

14.    Several of MediaAlpha's business partners have been the subject of law enforcement actions concerning lead generation and telemarketing.  *See, e.g., FTC v. Simple Health Plans, LLC et al.*, S.D. Fla. No. 18-cv-62593 ($195 million judgment against telemarketing and lead generation operation that bought and sold leads on Defendants' platform related to the deceptive sale of non-comprehensive healthcare products); *FTC v. Benefytt Technologies, Inc. et al.*, M.D. Fla. No. 8:22-cv-01794 (consent decrees with another of Defendants' former partners ordering payment of $100 million in consumer redress and banning two executives from the marketing or sale of healthcare-related products).

### Background on Health Insurance and Defendants' Healthcare-Related Lead Generation

15.    A significant portion of Defendants' lead generation business relates to health insurance and healthcare-related products.  Each year, millions of consumers who do not obtain health insurance through an employer shop for a plan

-7-

online, including the comprehensive health insurance plans offered on the federal marketplace at HealthCare.gov.

16.    Comprehensive health insurance, sometimes referred to as "major medical" insurance, traditionally involves an agreement between an insurance company and a consumer under which the company agrees to pay a substantial portion of the healthcare expenses the consumer may incur in exchange for the consumer's payment of premiums and a deductible.

17.    The Patient Protection and Affordable Care Act ("ACA") sets standards for comprehensive health insurance plans.  A "qualified health plan" under the ACA must cover people with pre-existing conditions without charging more for the insurance plan, and must provide ten enumerated essential health benefits, including coverage for prescription drugs and preventive care.  Qualified health plans, which sometimes are referred to colloquially as "Obamacare" plans, also conform to established limits on out-of-pocket expenses, like deductibles, copayments, and coinsurance.  Only ACA-qualified health plans are offered on the marketplace at HealthCare.gov.

**Defendants Advertise Low-Cost, ACA-Qualified, Comprehensive Health Insurance Using False Government Affiliation Claims**

18.    Defendants capitalize on consumers' interest in ACA-qualified plans, and have relied on video, paid search, and other advertising to drive online traffic to their healthcare-related lead generation websites.  As shown in the examples

below, Defendants' ads have routinely and falsely suggested Defendants are affiliated with the government and offer access to low-priced, comprehensive health insurance plans.  Defendants have spent millions of dollars to ensure that their ads are displayed to consumers on various popular platforms, and the ads have attracted millions of views.

19.     Defendants' marketing videos have featured clips of U.S. presidents speaking about healthcare or low-cost insurance, leading consumers to believe that Defendants are affiliated with government healthcare programs and offer low-cost, comprehensive health plans.  In one speech used in several videos, former President Biden states that: "4 out of 5 Americans shopping on the Obamacare marketplace can get quality health care with a premium of $10 a month or less."

20.     Defendants' video ads often have featured paid actors portraying consumers who purport to be satisfied with Defendants' services.  These ads frequently have included specific details about Defendants' supposed plans and pricing.  In many instances, for example, actors have touted a non-existent "Health Insurance Give Back Program," explaining that under this program, they "only had to pay $38 a month" for insurance or that they "just saved over $1274 a month" after contacting Defendants.

21.     Defendants' ads have even suggested that Defendants provide access to free health plans and will facilitate direct cash payments to consumers.  In the

following example, Defendants offered a "FREE HEALTH INSURANCE PLAN," which "[t]he Administration had approved." The ad features a video of an actor pretending to be a consumer holding up a fake approval letter he supposedly received after contacting Defendants, which incorporates a fake insurance card and notice about fake "cash benefits." A portion of the template Defendants created for the prop letter also follows.



**Image A (Obamacare Plans Ad with Video Still Image) (June 2023)**

Prop 1: Approval Letter



**Image B (Prop Template with Fake ID Card and "Cash Benefits" Banner)**

22.    Defendants have underscored these fake consumer testimonials with endorsements from numerous celebrities, whom Defendants have paid to tout their purported low-cost, comprehensive insurance plans.  These celebrities also highlighted Defendants' fictional "Health Insurance Give Back Program."

23.    Examples of the claims celebrities and actors have made in Defendants' scripted advertising videos include the following:

- **Celebrity endorser:** "Hey it's Floyd Money Mayweather, do you need health insurance? Then you want to hear this $29 per month health insurance hack. It's called the Health Insurance Give Back Program and 90% of uninsured Americans qualify. It covers pre-existing conditions, prescriptions, catastrophic, dental for your kids, and more. Trust me. It takes only 15 minutes and can change your life. Make the 15 minute call right now."

- **Actor portraying consumer:** "I found a plan for only $29 a month that even includes my daughter's dental.  Without the program, I was looking at an insurance bill of more than $700 a

month. I didn't know what to do. There was no way I could afford that. Then I saw on the news they were talking about how the Health Insurance Give Back Program can get your health insurance for the price of a Netflix subscription."

- **Actor portraying doctor:** "If you are seeing this video now, the program is still available. So to check your eligibility, simply click below. It will take you to a secured website where you will need to fill out a 2 minute form and find a number for the program. The call is 100% free, and they'll go over your options to see if you qualify for $29 a month plans. Thousands have already taken advantage of the program so go ahead, make the call to see how much money you can save."

24.    The text Defendants display on-screen in conjunction with these video ads has reinforced Defendants' deceptive claims. For example, as depicted in the image below, using one of their social media accounts, "@obamacareplans3088," Defendants claimed: "If you sign up today, the government will give you a full coverage policy for only $10/month, which includes FREE copays, FREE check-ups, FREE treatments, and much more…. Click the link below & CALL RIGHT NOW!"

\* \* \*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



**Image C (Obamacare Plans YouTube Video Ad Still Image) (June 2023)**

25.     Defendants' partners have also made misleading government affiliation claims similar to those in Defendants' text and video ads.  For example, one of Defendants' largest lead suppliers ran deceptive advertisements for non-existent "Trumpcare" insurance on Google and Facebook.  Defendants were aware of this conduct and even internally circulated an article that identified the lead supplier partner and highlighted the partner's deceptive practices.  Defendants continued to collect hundreds of thousands of dollars in fees from the sale of that partner's leads.

26.     Defendants also pay affiliate marketing partners to drive traffic to Defendants' lead generation websites using similar deceptive government

affiliation claims. Defendants could reject misleading text implying a government affiliation, as they reserve the right to review and reject or cancel any advertisement in their contracts with partners, but they often do not do so. In fact, Defendants have suggested their partners use language that implies a government affiliation, including, for example, when Defendants' senior director for media operations advised an affiliate to use the terms "Bidencare" and "BidenGovernmentHealth." Defendants have similarly allowed affiliates to disseminate emails from "Trump-Healthcare-Plans" and to use images promoting a "Trump Health Care Plan."

27.     Defendants even hired Dr. Jacqueline Darna, who is licensed as an anesthesiologist assistant, to appear in scripted "advertorials"—a paid segment on a news show—to drive traffic to Defendants' lead generation sites. Defendants sought out programs with a "'news' like/trustworthy" layout, where a news station logo would appear on the screen during her appearance.

28.     Defendants directed Dr. Darna to explain that Defendants offer "a FREE Helpline, assisting Americans [to] qualify for affordable health insurance coverage for as low as $29/month" through the "Health Insurance Giveback Program." Another part of the script instructed Dr. Darna to state that "millions of Americans … were able to qualify for a great health plan for $1/day." In one endorsement, Dr. Darna suggested that she recommended Defendants' services to

her patients—but that, too, was scripted by Defendants.  Dr. Darna has not used Defendants' lead generation sites.

29.    Defendants incorporated portions of Dr. Darna's televised endorsements into other video ads, which were then viewed millions of times online.  In many instances, the videos did not disclose that Defendants compensated the doctor and that the appearances were paid advertising, not real news.  An example of such an advertisement, which was viewed over one million times, is depicted below.



**Image D (Google Ad Incorporating Darna Advertorial) (Sept. 2023)**

30.    Defendants also have relied heavily on search engine advertising to promote low-cost health insurance and drive traffic to their lead generation websites.  Defendants have spent millions of dollars to ensure their search text ads are placed prominently—often at the top of the search results page before a link to HealthCare.gov—when consumers search for government-related healthcare terms,

including "Obamacare," "marketplace insurance," "Medicaid," and even "healthcare gov."  As shown in the sample Google search for "aca insurance" that follows, an ad for Defendants' Obamacare-Plans.com site appears at the top of the page, four positions above the link to the actual federal marketplace for ACA-qualified plans, HealthCare.gov.



**Image E (sample Google search results for "aca insurance") (April 2024)**

31.    Defendants have similarly targeted consumers who live in states that operate their own insurance exchange for ACA-qualified plans, using search terms

associated with those state-run marketplaces, such as "Covered California" or "Massachusetts Health Connector."

32.    In the example of paid search ads for Defendants' "Obamacare-Plans.com" site below, Defendants emphasize the open enrollment period and claim that interested consumers can "Apply Here Now!," "Apply Today!," and will be able to access a "Quick and Easy Eligibility Process" via the site.  Defendants entice consumers to click through to their Obamacare-Plans.com website with offers of "Health Plans from $1" per day and "Bronze Plan[s] from $40.00/mo," flagging in one ad that "Subsidy Rates [are] Available."



**Image F (Google ad – search for "obamacare insurance") (Jan. 2023)**



**Image G (Google ad – search for "aca plans") (Nov. 2024)**

33.    Defendants also highlight open enrollment and purport to offer access to low-cost products in the following ad for their ConnecticutHealthPlans.org site. In this case, Defendants claim that consumers can "Enroll Today and Save 75%!" on some unspecified health plan, and will find the "Lowest Rates Possible" on Connecticut health plans via Defendants' site, such as "$30/Month!"

\* \* \*

Ad · https://www.connecticuthealthplans.org/    ⋮

Open Enrollment Extended: 1/15 - Connecticut Health Insurance

Obamacare Coverage Does Not Expire Until the End of 2023. **CT** Plans from $30/Month! Don't Miss the Jan 15 Deadline. If You Live in **CT**, **Enroll** Today and Save 75%! Lowest Rates Possible. Platinum Plans. Affordable Health Care. Stop the Tax Penalty.

Open Enrollment · Obamacare Enrollment · Obamacare FAQs · Silver Health Plans

**Image H (Google ad – search for "connecticut open enrollment") (Jan. 2023)**

34.    Defendants have made claims about the cost of ACA-qualified plans they supposedly offer similar to those shown in Images F, G, and H in numerous other search engine advertisements, including claims such as "Lowest 2023 Obamacare Rates" and "Instantly Browse Prices, Plans, and Eligibility," and offers to "Help [consumers] Find An Obamacare Plan That Works Specifically for [them]."

35.    Defendants' domains, which appear in these advertisements, have furthered the misimpression that Defendants offer special access to ACA-qualified or otherwise government-approved health plans.  Indeed, some of the domains

Defendants have owned or operated directly incorporate the term "government" or "exchange" (e.g., GovernmentHealthInsurance.com, HealthExchangeQuotes.com). Defendants also have owned or operated at least four sites with domains incorporating the term "Obamacare" (ObamacarePlans.com, Obamacare-Plans.com, Obamacare-Health-Plans.com, ObamacareUSA.com), as well as others associated with U.S. presidents (e.g., Biden-Care.com, Trump-Healthcare-Plans.com).  And as shown above, Defendants have run numerous lead generation sites targeting consumers from states that operate their own health insurance exchanges (e.g., ConnecticutHealthPlans.org, KentuckyHealthPlans.org).

36.    Defendants have driven millions of consumers to their government-related lead generation sites via search engine advertising in recent years.  Since 2018, over 18 million consumers have clicked through Defendants' Google text ads to visit just two of Defendants' dozens of sites, ObamacarePlans.com and Obamacare-Plans.com.  And just one Google ad highlighting "KY Affordable Care Act Plans" and noting that consumers may "Sign Up for 2023 Coverage Now" resulted in over 200,000 clicks through to Defendants' site, KentuckyHealthPlans.org.

**Defendants' Websites Further Their Deceptive Claims**

37.    Defendants' ads direct consumers to Defendants' lead generation websites, where they have continued to tout affiliation with the government and

promise ACA-qualified plans at low prices.  In the image that follows, for example, Defendants emphasize the imminent end of the open enrollment period to obtain an ACA-qualified health plan with "[r]ates as low as $1/day," and invite consumers to "See Plans and Prices" by entering their location information.  The reference to "open enrollment" along with the logos of major insurance carriers again suggest that the "plans and prices" will relate to ACA-qualified, comprehensive insurance coverage.



**Image I (ObamacarePlans.com Sample Landing Page) (Jan. 2023)**

38.    Elsewhere on their sites, Defendants have similarly emphasized that

they will "show" consumers "plans that match [their] needs," and that consumers

will "be given quotes for all the major health carriers available to you, including"

numerous well-known major medical insurance plan providers.

39.    In the following example, Defendants indicate that consumers may

"enter their zip code" and then click on a button to "VIEW PLANS."  Further

down the page, Defendants reiterate that their "3-step process" concludes with

"See Quotes," where the consumer will be "presented with available plans which

fit your profile" and "given the option to work with a health insurance agent."



**Image J (HealthExchangeQuotes.com Sample Landing Page) (Jan. 2023)**

40.     Defendants also have represented that consumers may "Check Eligibility" for "premium tax credits" available through unspecified "government programs" by entering their zip code, as in the following example of one of their sites.  Consumers must click the "Check Eligibility" button to continue on the site.



**Image K (ObamacarePlans.com – Sample Landing Page 2) (Nov. 2023)**

41.     Once consumers submit their zip code on one of these sites, Defendants do not show them plans, prices, or "premium tax credit" eligibility information.  Instead, Defendants entice them to provide more and more personal information to see the specific plans and prices that Defendants promise.

42.     For consumers who proceed down this information collection funnel, Defendants often continue to emphasize that they will provide imminent access to "Obamacare" plan information.  In the image below, for example, Defendants indicate that the consumer is "on [their] way to comparing Obamacare options," and solicit more sensitive information, including information about household income and serious health conditions, to "see if [they] qualify" for those plans.



**Image L (Obamacare-Plans.com Sample Excerpt of Data Submission Flow)**
**(Jan. 2023)**

43.     At the end of the process, after requesting and obtaining a consumer's full contact information, household size, expected annual income, health history, and other demographic information, Defendants have again displayed a "call to action" submission button identical or similar to the "See Plans and Prices" or "See My Options" buttons below:



**Image M (Obamacare-Plans.com "See Plans and Prices" Submission Button) (Jan. 2023)**

* * *

-24-



**Image N (Obamacareplans.com "See My Options" Submission Button)**
**(Nov. 2024)**

44.    Defendants' lead generation websites related to non-healthcare products, such as automobile insurance, have incorporated a similar call-to-action button at the end of a series of requests for information from consumers (e.g., "See My Quotes").

45.    Consumers who have provided all the personal and sensitive information requested on Defendants' lead generation sites and finally reached and clicked the button at the end of the submission form have not been shown the

insurance plans with prices or quotes they were promised.  Instead, at that point,

Defendants typically display demand partner advertisements like those excerpted

below.  These ads continue to dangle the carrot of insurance plan quotes, but

clicking on them often sends the consumer down yet another lead generation

submission funnel, leading to further demands for personal information.



**Image O (ObamacarePlans.com – Sample Post-Submission Advertisements)**
**(Nov. 2023)**

46.    Defendants have employed various deceptive tactics to induce people

to click these ads.  As is shown in Image O, Defendants have insisted consumers

must "Act fast!," and a feature Defendants refer to as a "scarcity timer" counts down until an unspecified, non-existent "pre-approval" will expire.  Defendants' advertising page also represents that their purported service is popular, claiming that "301 people have called today."

### Defendants and Their Demand Partners
### Inundate Consumers with Solicitations

47.     After consumers submit their information, Defendants promptly begin robocalling to induce them to divulge more personal information and to speak with a demand partner hoping to sell them a health plan or other product or service over the phone.  Since 2018, Defendants have made millions of robocalls to consumers in states across the country who visited ObamacarePlans.com, just one of their many lead generation websites.  Over one million of those calls were to numbers registered on the National Do Not Call Registry at the time.

48.     Defendants often contact consumers multiple times over a short period.  And those calls do not include any Defendants' demand partners might have made to the same numbers after purchasing the leads.

49.     Defendants' scripted robocall messages have reiterated deceptive representations similar to those made in Defendants' ads.  In one such robocall message recorded by a voice actor, "Emma" at "the US Obamacare Health Insurance Helpline" instructs consumers to "[p]ress 1 to connect to see if you qualify for the free health insurance program approved by the Biden

administration!  This congress-approved program is part of a plan to make sure that low-income Americans get the care they need."  Apparently citing Defendants' own paid ads featuring Dr. Darna and various celebrities, another scripted robocall message indicated, "[t]he program has been endorsed by President Biden, [has] been on the news, is doctor-approved, and is backed by Floyd Mayweather, Dc Young Fly & Cedric the [E]ntertainer."

50.    In addition to the robocalls they receive from Defendants, many consumers are simultaneously flooded with direct solicitations from Defendants' demand partners.  Defendants often sell the same consumer leads to multiple demand partners—what they refer to as a "shared" lead.  Defendants' sale of shared leads to multiple demand partners encourages and exacerbates abusive telemarketing practices, as the telemarketers who purchase shared leads have an incentive to beat their competitors to the sale by quickly inundating consumers with multiple calls.  As indicated in Defendants' internal notes about concurrent solicitation, the sale of shared leads can leave consumers "feeling bombarded by all lead buyers trying to call them at the exact same time."

51.    By way of example, out of the hundreds of demand partners that have bought leads from Defendants to make calls pitching healthcare products, two Florida partners alone called numbers across numerous states hundreds of thousands of times between March 2023 and March 2024, including hundreds of

thousands of calls to numbers on the National Do Not Call Registry. These telemarketers also called many people repeatedly; one called most of the consumers they solicited at least 11 times, and the other called several consumers over 100 times.

52.    In selling these leads, Defendants have represented to their demand partners that the consumers have consented to be contacted, including via robocall, even if their telephone numbers may be on the National Do Not Call Registry. Defendants purportedly get such consent from consumers when asking for their personal information to browse plans and quotes. Unbeknownst to many consumers, there is a block of light fine print at the end of Defendants' submission pages, as exemplified above in Images M and N. By filling out the form and indicating an interest in "see[ing]" plans or quotes, Defendants claim consumers have consented to receive various marketing contacts from Defendants and their "network of advertisers," whose identities are concealed behind a hyperlink. These hyperlinked lists often include additional hyperlinks buried at the end, listing even more partners if clicked through. As a result, the entities for which a consumer is supposedly providing authorization to be contacted can run into the thousands.

53.    Not surprisingly, many consumers who complete Defendants' submission funnel in order to "see" healthcare plans or quotes do not know that they are supposedly consenting to receive robocalls, telemarketing calls, texts, and

emails from thousands of potential sales agents.  Numerous consumers have notified MediaAlpha directly that they did not consent to such solicitations, including the following examples sent via email:

- "When I entered your site it leads one to believe that you are getting quotes online.  It is grossly misleading.  Now I have my name and phone number out there and I gave no such approval to [b]e texted and called and emailed and harassed in such a manner. I expected the quote to come online.  Now who knows where my data is going."

- "Your website is misleading, I was under the misconception that I would be provided with quotes online.  I never would have imagined I would be bombarded with phone calls nonstop."

- "I filled out your lengthy form on line today in order to get what I was le[]d to believe was comparison quotes from several insurance agencies. Instead I get a list of auto insurance companies for which I have to provide each the same information again to get a single quote. Why did I have to provide you all that information and what are you doing with it? I do not want companies calling me with their sales pitches. All I wanted was a list of comparison quotes without filling out a bunch of new forms or talking to a pile of insurance sales people. Your ad is very misleading."

- "When I visited the ACA site for a quote for health insurance **did I sign off on having 50 insurance salespeople to call, email, and text me to visit with them about options?** As soon as I hit submit on your site my phone and emails BLEW up with calls, texts, and emails. Would ANYONE want to do that, visit with 50 people about different plans? PLEASE stop the nonsense. I merely wanted one general quote **ON** the website."

54.    In one instance, a third-party demand partner even flagged Defendants' inadequate fine-print.  "Before asking for contact information," the partner stated, "it should be made more clear (in addition to the small print

disclaimers) that there will be calls/contact from 'licensed insurance agents.'"

55.    Defendants' internal correspondence confirms they well understand consumers are inundated with unwanted solicitations after a visit to one of Defendants' sites.  Indeed, one of Defendants' senior directors has recommended that Defendants' marketing emails to consumers should appear to come from a business partner rather than from Defendants' website they visited, because that could make it more likely consumers would click through, given consumers' "negative" view of Defendants after receiving "[a]ll those calls from when they signed up" on Defendants' site.

56.    In 2023 alone, over 171,000 consumers submitted do-not-contact and related requests in conjunction with telemarketing calls, text messages, and emails generated via Defendants' websites and platform.

57.    Many consumers have lodged specific complaints with Defendants regarding the overwhelming number of unanticipated, unwanted, and abusive telemarketing calls that resulted from visits to Defendants' sites, including the following example emails to MediaAlpha:

- "I have received 47 calls within one day.  At this point, this is harassment."

- "I have been bombarded by over 40 calls since I inputted my info in what I thought was an official government site."

- "I have received nearly 80 phone calls after going on your site thinking it was a legitimate health insurance administrator.  You

are harassing me and it needs to stop now.  When I ask all the people you sold my information to to put me on the do-not-call list, one lady said that is not possible.  The rest hang up on me.  I receive calls from numerous different numbers on a daily basis, several times as day.  MAKE IT STOP."

58.     Making matters worse, Defendants and their partners have not promptly stopped these unwanted communications after such notification.  When a consumer submits such a request, it can take days for Defendants to notify all demand partners that purchased the lead, while the telemarketers continue to barrage the consumer with calls.  Defendants also typically send a formulaic email in response to consumers' requests noting the consumer has been added to Defendants' do not call/email lists, and that the consumer "may need to make a similar request of anyone who contacts you."  But Defendants are well aware that their demand partners often ignore such requests and continue to sell them consumer leads.  As a result, even consumers who attempt to answer each of the numerous calls they may get from Defendants' business partners and ask not to be contacted often continue to be flooded with solicitations.

59.     In one instance, a consumer reported that she had received "a barrage of calls" after "mistakenly believing that [Defendants'] site was part of Obamacare," and that she had "asked, tirelessly, for these sales calls to stop," but to no avail.  Defendants responded that her do-not-call request would be passed along to Defendants' partners.  Over two weeks later, the same consumer reported

that she "continue[d] to receive calls soliciting health insurance," and that the "tone and quantity of the calls is antagonistic. . . . I never intended to sign up for this 'service.'"  Nearly a week later, after receiving further assurance from Defendants that their partners would be notified of the consumer's request, she again reported receiving multiple marketing calls, including three that day.

60.    In 2019, a manager forwarded a consumer complaint to other employees of Defendants under the subject line, "Another happy customer."  In the underlying message, the consumer reported that after visiting Defendants' site, her "phone started ringing with insurance companies calling me, and it has been incessant, all day, and non-[s]top."  The consumer went on, saying she "received 50 calls yesterday, 20 today," and that the telemarketers who were calling did "real harm" and "refuse to honor [her] request to put [her] on their do not call list."  She also confirmed that she had visited Defendants' "website and submitted a do not contact request on the web form.  Still, the calls roll in."

61.    Years later, in 2022, MediaAlpha's "main contact" at a large insurance company reported a similar problem—she was getting "harassed" by telemarketers at the "National Enrollment Center" after filling out the form on Defendants' Obamacare-Plans.com site.  She went on: "They are calling me from 7 am to 9pm.  When I have asked their agents to take me off of their list they have been nasty and argumentative.  In fact, just now, when I asked to be removed from

the calling list the lady said, 'that ain't the way it works honey and you ain't telling me what to do.' They are in violation of every TCPA rule I can think of and they completely lack scruples."

62.    In 2023, a MediaAlpha manager reported to colleagues that "the unthinkable happened" with a sad emoji—she had accidentally entered her real phone number while testing MediaAlpha's mobile site. After she relayed the "unthinkable" mistake of providing real contact information in a MediaAlpha mobile form, a senior director responsible for MediaAlpha's compliance and monitoring joked that the colleague should "get a new number," a senior manager reacted "holy cannoli," and a company vice president responded "WOW."

### Defendants' Partners Continue Defendants' False Government Affiliation and Healthcare Claims

63.    Defendants' telemarketer demand partners frequently further Defendants' deception when they make their sales pitch. In many instances, the telemarketer partners have introduced themselves to consumers in a deceptive way, including by saying that they work at the "National Enrollment Center" or something similar, implying an affiliation with a government marketplace. In some cases, the telemarketers even represent directly that they work for the government. For example, one telemarketer partner told a consumer, "I'm a licensed health insurance agent and benefits coordinator for the headquarters of the state of New Jersey." And when a consumer asked another telemarketer if their

department was "government operated," the telemarketer responded "yes, it is."

64.    Defendants' telemarketer demand partners also have misrepresented the features, benefits, and limitations of healthcare-related products.  For example, one telemarketer downplayed an electronic form indicating that the product being pitched was "not major medical" insurance, falsely suggesting that was because the telemarketer had "removed three major liabilities" from the plan—care related to maternity, substance abuse, and mental health.  Similarly, another telemarketer discouraged a consumer from inquiring if they noticed in the written material they would get in the mail that the product purchased was just a "supplement to health insurance," suggesting it was described that way only because the plan did not cover treatment for psychiatric conditions or substance abuse.

65.    Defendants' telemarketer demand partners have further misrepresented information about the ACA, "Obamacare," or government health programs.  For example, one of Defendants' partners falsely told a consumer that health insurance rates would be going up the next day at "the start of phase 2 of open enrollment," and indicated that there were no subsidies for ACA plans available because the government spent the money on relief efforts related to the COVID-19 pandemic.  Defendants' demand partners also tell consumers they must pay non-existent government fees to sign up for a health plan.  In one such call, the telemarketer told a consumer that he qualified for a free plan, but "the new Biden

administration" imposed an annual $190-$250 "health step fee" to enroll.  In

another instance, a telemarketer falsely told a consumer they had to pay a $99

health plan enrollment fee "that [the consumer's] state charges."

### Defendants and Their Partners are Not Affiliated with the Government

66.    Defendants and their partners are not affiliated with the government.

But since they operate domains with what seem like official government names,

target government-related search terms, and use terminology associated with ACA-

qualified health plans offered on government marketplaces, many consumers who

visit Defendants' sites understandably believe that they are operated by or

affiliated with the government.  Indeed, in private conversations with business

partners, a MediaAlpha lead sales manager has conceded that consumers may be

"confused with [Defendants'] sites thinking they were calling for gov[ernmen]t

ass[is]t[ance] through healthcare.gov but [Defendants] are not affiliated," and

"Obamacareplans.com sound[s] like it could be gov[ernmen]t related but it's not."

67.    Numerous consumers have told Defendants that they were deceived

by their government affiliation claims, including in the following emails sent to

MediaAlpha:

- "I began to submit my personal information to your website obamacareplans.com thinking it legitimately represented the official healthcare service of the United States  . . .  In three days I have received at least 30 phone calls because of your website.  I can't even use my phone to call my family or for emergency because your robo callers and telemarketers are calling me non-stop . . ."

-36-

- "I submitted a form that was required to see rates for my insurance research, and was immediately accosted with dozens of phone calls, even texts and emails.  Please remove my information from your lists immediately.  Fielding dozens of calls is absurd and I would have never considered this as an avenue if I knew this would happen.  Isn't this a government site? Is there no respect for personal information?"

- "I signed up thinking it was a government health care plan, not knowing or realizing that my email and phone number would be shared with a series of brokers all over the country."

68.    Third parties also have informed Defendants that their government affiliation claims are deceptive.  In late 2021, for example, Microsoft blocked Defendants from using its search engine advertising to drive consumer traffic to several of Defendants' sites, including ObamacarePlans.com and GovernmentHealthInsurance.com.  A Microsoft representative explained the decision in an email: "Because the domains contain the terms 'Obamacare' and 'government,' they can mislead users into thinking they are clicking on a government affiliated site.  And because these domains are not government sites, it violates Microsoft Advertising's Government Services Policy."

69.    In at least two instances, Defendants have paid a penalty and agreed to cease certain conduct associated with government-related lead generation pages in response to state regulatory inquiries.  Defendants also relinquished control over a domain for a state-specific lead generation website as part of a settlement regarding claims that the site deceptively mimicked the state's government health

insurance marketplace.  Nevertheless, Defendants continued to operate similar sites and to engage in other similar business practices throughout the United States.

70.    In fact, months after Microsoft blocked Defendants from using misleading domains, Defendants internally considered how to manipulate a government affiliation disclaimer to make it as inconspicuous as possible in light of regulations requiring the opposite.  Reviewing a draft of the disclaimer and site logo, one of Defendants' senior directors indicated that they should "def[initely] go smaller…much smaller lol" on the disclaimer, and reacted with a "joy" emoji when a manager responded that the government affiliation disclaimer should be "barely legible."

**Defendants' Partners Actually Sell Consumers Expensive Non-ACA Products**

71.    Defendants do not sell any type of insurance themselves, and they do not offer ACA-qualified marketplace plans at special prices.  Further, the low prices that Defendants have used in their ads do not represent the actual cost of any particular health plan that their partners offer for sale.

72.    Defendants' affiliates and supply partners often make similar deceptive claims that are untethered to what telemarketer partners actually sell.  In 2022, one demand partner complained to Defendants that over 20% of the consumers they contacted after purchasing leads on Defendants' platform were not interested in the Medicare Supplement plans that the partner sold.  Instead, the

consumers requested non-existent grocery cards, stimulus checks, gift cards, prize money, gas cards, housing vouchers, and free vacations that apparently had been advertised in order to capture consumers' interest and generate the leads.  In response, Defendants downplayed the concerns about the lead generator, which is one of Defendants' largest supply partners, blaming the consumers for any confusion.

73.    Defendants have at times referred to supply partners' deceptively-generated leads offered on their platform as "low-quality," "questionable," or "bad" traffic.  As one MediaAlpha employee put it in internal correspondence about "bad" traffic, however, a large supply partner that provides high lead volume ultimately "drives the profits."

74.    Defendants understand that consumers who visit sites like ObamacarePlans.com are interested in ACA-qualified health plans, and Defendants are well aware that many of their partners do not sell them such products. Telemarketers who purchase Defendants' and their supply partners' leads often use them to sell consumers other products that are not ACA-qualified plans or equivalent to such insurance, such as short-term, limited benefit, and health sharing plans.  Limited benefit and other non-ACA health plans often are "bundled" with other products and services, such as life insurance policies and telemedicine programs.  Defendants' demand partners also have used Defendants' leads to pitch

products and services that have nothing to do with healthcare or insurance, such as identity theft and debt relief packages.

75.   By way of example, just two of Defendants' telemarketer demand partners were responsible for hundreds of thousands of sales calls to consumers in recent years, including thousands of interstate calls.  These partners have routinely purchased leads from Defendants' "Obamacare" sites, but rarely if ever use those leads to market and sell qualified health plans under the ACA.  In fact, as recently as April 2024, one of those telemarketer partners had never sold an ACA-qualified plan to anyone, whether in conjunction with Defendants' leads or otherwise.  Instead, both partners have sold consumers who visited Defendants' "Obamacare"-related sites a range of other healthcare products, including non-comprehensive limited benefit plans.  Yet Defendants have repeatedly encouraged these telemarketers to increase bids so they can purchase more leads generated on sites associated with "Obamacare."

76.   The non-ACA products and services sold by many of Defendants' partners—which often cost over $200 per month—can leave unknowing consumers unprotected.  For example, limited benefit plans provide supplemental benefits capped at a specific amount depending on the service or disease.  In other words, a plan member might only be entitled to a $1,000 benefit for each day of a hospital admission, without regard to the tests, treatments, or surgeries provided, or

$3,000 total for a 3-day hospital stay.  All other charges arising from the hospital care would be the patient's responsibility if they did not have another health plan. The average total cost of a 3-day hospital stay is around $30,000.

**Defendants Condone and Further Their Partners' Deceptive Sales Practices**

77.    Defendants retain significant control over their telemarketer demand partners' use of leads acquired via Defendants' platform.  As with their affiliates and supply partners, Defendants' demand partners must sign agreements requiring them to follow laws and regulations Defendants deem relevant (including the Telemarketing Sales Rule).  By contract, Defendants have the right to monitor and investigate telemarketer demand partners' conduct, to conduct audits, to review sales call recordings, and to suspend or terminate a demand partner at any time for any reason.

78.    Despite this authority, and despite being presented with substantial evidence of widespread misconduct collected over many years—including complaints and audio recordings confirming that telemarketer demand partners frequently make false or misleading statements to consumers—Defendants have furthered and profited from their telemarketer partners' misconduct.

79.    For example, in 2018, the FTC sued Defendants' former partner Simple Insurance Leads and its affiliates ("Simple Health") for violating the TSR by misrepresenting healthcare products as comprehensive insurance, among other

law violations.  In 2024, a federal district court entered a $195 million judgment in favor of the FTC and against Simple Health and their former CEO, finding the operation violated the TSR and was a "classic bait and switch scheme—aided by rigged internet searches, deceptive sales scripts, and predatory practices."  (*See* S.D. Fla. No. 18-cv-62593, Dkt. 495 at 2, 19.)

80.    Over a year before the FTC filed its lawsuit against Simple Health, one of Defendants' senior directors predicted internally that the telemarketer partner would "likely be shut down or not able to pay a large amount for the calls they were buying previously" due to deceptive sales practices.  The senior director further expressed concern about the resulting "hit" to Defendants' revenues when Simple Health stopped operating or could not buy Defendants' leads.

81.    Simple Health continued to buy leads on Defendants' platform until it ceased operating as a result of the FTC's lawsuit.  Over their long partnership, Simple Health paid Defendants nearly $900,000 for leads, including thousands of leads from Defendants' sites related to "Obamacare," even though Defendants knew Simple Health deceptively sold consumers non-ACA healthcare products. Simple Health also operated its own deceptive lead generation websites, and used Defendants' platform to sell over $1 million in leads during their partnership.

### Ongoing Conduct

82.    Based on the facts and violations of law alleged in this Complaint, the

FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC, because, among other things: Defendants remain in the lead generation business and continue to gather consumer information using deceptive and unlawful practices; Defendants have a long history of continuous conduct of the type described above; Defendants engaged in their unlawful acts and practices knowingly, and continued to employ unlawful practices after learning of the FTC's investigation; and Defendants maintain the means, ability, and incentive to engage in similar conduct in the future.

## VIOLATIONS OF THE FTC ACT

83.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

84.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I
### Misrepresentations of Government Affiliation

85.    In numerous instances, in connection with their lead generation or telemarketing activities, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants are, represent, or are affiliated with a federal or state government entity or officer thereof.

86.    In fact, Defendants are not, do not represent, and are not affiliated with any federal or state government entity or officer thereof.

87.     Therefore, Defendants' representations as described in Paragraph 85, are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II
## Deceptive Claims Regarding Healthcare-Related Products

88.     In numerous instances, in connection with their lead generation or telemarketing activities, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.  Defendants sell ACA-qualified or otherwise comprehensive health insurance plans; or

    b.  Defendants sell low-cost health insurance plans, such as plans that cost $1 per day or $30 per month.

89.     Defendants' representations as described in Paragraph 88 are false, misleading, or are not substantiated at the time that the representations are made.

90.     Therefore, Defendants' representations as described in Paragraph 88 constitute a deceptive act and practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III
## Misrepresentations Regarding Collection of Personal Information

91.     In numerous instances, in connection with their lead generation or telemarketing, Defendants have represented, directly or indirectly, expressly or by

implication, that Defendants will use the information they collect from consumers to display insurance plan prices or quotes.

92.     In fact, Defendants are not collecting consumers' personal information to display insurance plan prices or quotes, but for the purposes of telemarketing and selling the information to third parties as leads.

93.     Therefore, Defendants' representations as described in Paragraph 91 are false or misleading and constitute a deceptive act and practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV
### False or Misleading Endorsements

94.     Through the means described in Paragraphs 27-29, Defendants have represented, directly or indirectly, expressly or by implication, that certain reviews and testimonials of Defendants' business reflected a doctor's independent and objective opinion based on the doctor's actual exercise of medical expertise.

95.     In fact, the reviews and testimonials have not reflected the doctor's independent and objective opinion based on the actual exercise of medical expertise.

96.     Therefore, the making of the representations as described in Paragraph 94 is false and misleading in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count V**
**Deceptive Failure to Disclose Endorser was Paid**

97.    Through the means described in Paragraphs 27-29, Defendants have represented, directly or indirectly, expressly or by implication, that advertisements featuring a doctor reflected the opinion of an expert who had evaluated Defendants' business.

98.    In numerous instances, Defendants have failed to disclose or failed to disclose adequately that the doctor received compensation, including monetary payment, to promote Defendants' business.  These facts would be material to consumers in their decisions regarding using Defendants' business.

99.    Defendants' failure to disclose or disclose adequately these facts, in light of the representation made, was, and is, a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

100.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101, 6108.  The Commission adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.

101.    Under the TSR, "telemarketing" is a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable

contribution, by use of one or more telephones and which involves more than one interstate phone call. 16 C.F.R. § 310.2(hh).  A "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephones calls to or from a customer or donor. *Id.* § 310.2(gg).  An "outbound telephone call" is a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  *Id.* § 310.2(x).  A "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. *Id.* § 310.2(ee).

102.   Defendants are telemarketers engaging in telemarketing when initiating telephone calls to consumers.  Defendants through their lead generation activities provide substantial assistance or support to sellers and telemarketers.

103.   The TSR established the National Do Not Call Registry maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at DoNotCall.gov.  The TSR prohibits telemarketers and sellers from initiating an outbound telephone call to numbers on the Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an established business relationship with that consumer, and the consumer has

not stated that he or she does not wish to receive such calls.  16 C.F.R. § 310.4(b)(1)(iii)(B).  Such express agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person.  16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

104.   The TSR prohibits telemarketers and sellers from initiating an outbound telephone call that delivers a prerecorded message ("robocall"), unless the seller has obtained from the recipient of the call an express agreement, in writing, that: (i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person; (ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service; (iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and (iv) Includes the recipient's telephone number and signature.  16 C.F.R. § 310.4(b)(l)(v)(A)(i)-(iv).

105.   The TSR applies to individuals or companies other than "sellers" or "telemarketers" if these individuals or companies provide substantial assistance or support to sellers or telemarketers.  Specifically, it is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer

when that person knows or consciously avoids knowing that the seller or

telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d),

or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

106.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. §

6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

the TSR constitutes an unfair or deceptive act or practice in or affecting commerce,

in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count VI**
**Abusive Telemarketing Acts and Practices in Violation of the TSR:**
**Initiation of Calls to Numbers on the National Do Not Call Registry**

107.    In numerous instances, in connection with telemarketing, Defendants

have initiated or caused the initiation of outbound telephone calls to telephone

numbers on the National Do Not Call Registry to induce the purchase of goods or

services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

**Count VII**
**Abusive Telemarketing Acts and Practices in Violation of the TSR:**
**Initiation of Unlawful Prerecorded Messages**

108.    In numerous instances, in connection with telemarketing, Defendants

have initiated or caused the initiation of outbound telephone calls that delivered

prerecorded messages to induce the purchase of goods or services in violation of

the TSR, 16 C.F.R. § 310.4(b)(1)(v).

## Count VIII
## Assisting and Facilitating Violations of the TSR

109.    In connection with the generation and sale of leads to third parties, Defendants have provided substantial assistance or support to "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

110.    In numerous instances, in connection with telemarketing, those sellers and/or telemarketers to whom Defendants have provided substantial assistance or support have engaged in deceptive telemarketing acts or practices, in violation of 16 C.F.R. § 310.3(a)(1)-(2).

111.    In numerous instances, in connection with telemarketing, those sellers and/or telemarketers to whom Defendants have provided substantial assistance or support have initiated or have caused the initiation of outbound telephone calls to telephone numbers on the National Do Not Call Registry to induce the purchase of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B).

112.    At all relevant times, Defendants knew or consciously avoided knowing that one or more such sellers or telemarketers to whom they provided substantial assistance or support were engaged in violations of §§ 310.3(a) and 310.4 of the TSR.

113.    Defendants' substantial assistance and support, as described in Paragraphs 109-12, above, violates the TSR, 16 C.F.R. § 310.3(b).

## VIOLATIONS OF THE GOVERNMENT AND BUSINESS IMPERSONATION RULE

114.    The Impersonation Rule, 16 C.F.R. Part 461, became effective on April 1, 2024. Under that Rule, it is a violation to "materially and falsely pose as" a government entity, as well as to "materially misrepresent" an "affiliation with, including endorsement or sponsorship by" a government entity.

115.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Impersonation Rule constitutes an unfair or deceptive act or practice under Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

116.    For each violation of the Impersonation Rule, Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes the Court to grant relief as it finds necessary to redress injury to consumers, including monetary relief, rescission or reformation of contracts, the refund of money or return of property, and public notification respecting the rule violation or the unfair or deceptive act or practice.

### Count IX
### Violations of the Impersonation Rule

117.    In numerous instances, in connection with their lead generation or telemarketing activities, Defendants represent, directly or by implication, affiliation with, including endorsement or sponsorship by, a government entity or officer thereof.

118.    In fact, Defendants are not affiliated with, or endorsed or sponsored

by, any government entity or officer thereof.

119.    Therefore, Defendants' acts or practices described in Paragraph 117, above, are violations of the Impersonation Rule, 16 C.F.R. pt. 461, and therefore also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

120.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the Impersonation Rule.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

121.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the Impersonation Rule by Defendants;

122.    Award monetary and other relief within the Court's power to grant; and

123.    Award any additional relief as the Court determines to be just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Dated: 08/06/2025

Respectfully submitted,

Matthew G. Schiltz (*pro hac vice*
forthcoming)
mschiltz@ftc.gov
Rachel Granetz (*pro hac vice*
forthcoming)
rgranetz@ftc.gov
FEDERAL TRADE COMMISSION
230 S. Dearborn, Suite 3030
Chicago, IL 60604
Phone: 312-960-5619 (Schiltz)
          312-960-5620 (Granetz)

Local Counsel:
David L. Hankin (CA Bar No. 319825)
dhankin@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Phone: (310) 824-4317